IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re<br><br>    Union Square Associates, LLC<br><br>    Debtor, | Bankruptcy Case No. 05C-24790<br><br>Chapter 11 |
| 25th Street Associated, LLC, and<br>Apex Management, Inc.,<br><br>    Plaintiffs,<br><br>vs.<br><br>Union Square Associates, LLC;<br>Knight Brothers Construction Co.,<br>d/b/a Roger Knight Construction;<br>Sheet Metal Works, Inc.; Proterra<br>Companies, Inc.; Alfred Belt; Charles<br>Akerlow; Gerard Tully; and Michael<br>Akerlow,<br><br>    Defendants, | Adversary Proceeding No. 07-02144<br><br>MEMORANDUM OPINION<br>GRANTING PLAINTIFF'S<br>MOTION FOR PARTIAL<br>SUMMARY JUDGMENT |

This matter came before the Court on June 24, 2008 on the motion for summary judgment

of Union Square Associates, LLC, (the "Debtor"). The Debtor's motion for summary judgment

13

was joined by Proterra Companies, Inc., Alfred Belt, Charles Akerlow, Gerard Tully, and Michael Akerlow, which, for purposes of this ruling, will collectively be referred to as the "Co-Defendants." A cross motion for partial summary judgment was filed by 25th Street Associates, LLC and Apex Management, Inc. (the "Plaintiff").

Jeffrey W. Shields and Troy Aramburu appeared on behalf of the Debtor, Diana Gibson and Michael Petrogeorge appeared on behalf of the Co-Defendants, Jeremy Hoffman appeared on behalf of the Plaintiff, James Lewis appeared on behalf of Knight Brothers Construction Co., Inc. ("Knight Brothers"), and Peter Kuhn appeared on behalf of the United States Trustee.

## JURISDICTION

This controversy involves a dispute over property which is claimed to be property of the Debtor's bankruptcy estate. As such, this controversy is "Core" to this bankruptcy proceeding under 28 U.S.C. § 157(b)(A),(E), (K) & (O) and 28 U.S.C. § 1334.

## UNDISPUTED FACTS

1. Prior to the Debtor's bankruptcy petition date, the Debtor was in the business of development, financing, construction, marketing and sales of a 44 unit condominium project located in Ogden, Utah.

2. In furtherance of the project, two loans were taken out to finance the project. One loan was obtained by Proterra Companies, Inc., from the Ogden City Redevelopment

Authority ("RDA"). The other loan was obtained by the Debtor from First National Bank of Layton ("FNB").

3. The RDA loan was personally guaranteed by Belt, C. Akerlow, Tully and M. Akerlow.

4. The RDA loan was expressly subordinated to the FNB loan.

5. In October 2004, Debtor was in default under the terms of both the FNB loan and the RDA loan.

6. Having failed to cure the default under the FNB loan, a trust deed sale was scheduled for March 31, 2005.

7. On March 30, 2005, Plaintiff entered into an agreement with Debtor to acquire the debts owed on the FNB and the RDA loans (the "March 30, 2005 Agreement").

8. By separate agreements with FNB and RDA, Plaintiff acquired both loan agreements, trust deeds, promissory notes, guarantees and other loan documents.

9. The March 30, 2005 Agreement included the following terms: 1) that Debtor would refrain from filing a bankruptcy petition; and 2) that Plaintiff would credit bid at the anticipated trustee's sale (under the FNB trust deed) in an amount sufficient to prevent any claim to a deficiency against Debtor or the Co-Defendants as guarantors of both the FNB and the RDA loans.

10. Debtor's principals understood, pursuant to the March 30, 2005 Agreement, that Debtor would not receive any proceeds from the foreclosure sale.

11. On March 31, 2005, an involuntary petition was filed against the Debtor. As a result of the involuntary petition, the trustee's sale was not conducted.

12. On April 7, 2005, Debtor, with the consent of Plaintiff, entered into a management agreement with Moca Management, Inc. to promote the sale of condominium units (the "Management Agreement").

13. The Management Agreement directed that all net proceeds from sales of the condominiums (the "Sales") were to be paid to Plaintiff.

14. The Management Agreement confirmed that Plaintiff agreed to bid, at any foreclosure sale conducted on the project, an amount equal to any and all indebtedness secured by the FNB and RDA notes, so that no deficiency would remain after sale.

15. On July 26, 2005, the Court entered an Order granting relief from the automatic stay with respect to Plaintiff.

16. On various dates between April 18 and July 5 of 2005, Debtor closed on the Sales of condominium units to various third-party purchasers.

17. Because of various mechanic's liens, a judgment against Debtor, and the pendency of the involuntary petition, First American Title Insurance Company ("FATCO") required that Debtor deposit the net proceeds of the Sales into an escrow account with FATCO, until the sum of $700,000 had been deposited into escrow, and that Debtor indemnify FATCO from any loss or damage under the title insurance policies with respect to certain exception matters.

18. Had FATCO not insisted on establishing the escrow fund for its own protection prior to the foreclosure sale, plaintiff would have received the entire net proceeds generated from the Sales.

19. Debtor executed and delivered to FATCO an instrument entitled "Escrow Instructions (Indemnity)" with each closing ("Escrow Instructions").

20. Pursuant to each of the Escrow Instructions, FATCO was authorized and directed to hold the net proceeds of the subject sale (until an aggregate of $700,000 had been withheld) in an interest bearing account, with interest accruing in favor of Plaintiff, until such time as FATCO received executed reconveyances, releases of judgment, or other documents sufficient to release or satisfy the Exception Matters described in the Escrow Instructions.

21. Upon satisfaction of the Exception Matters, the Escrow Instructions authorized and directed FATCO to disburse the escrowed funds to Plaintiff.

22. Between April 18 and July 5 of 2005, Debtor closed on the sale of thirteen units. From the sale of the thirteen units, $700,000 was deposited into the escrow account held by FATCO, and $374,696.46 was disbursed to Plaintiff to be applied against the amount owed on the FNB loan.

23. FATCO continues to hold the $700,000 plus interest in escrow.

24. After entry of the Court's order terminating the automatic stay, Plaintiff issued a new notice of trust deed sale scheduled for August 22, 2005.

25. In preparation for the trust deed sale, Plaintiff prepared a payoff calculation with the intent of honoring the March 30, 2005 Agreement to credit bid an amount equal to all indebtedness currently remaining on Debtor's obligations on the FNB and RDA notes.

26. Plaintiff's payoff calculation was prepared in consultation with attorney Tom Cook of Lundberg & Associates.

27. Tom Cook conducted the foreclosure sale of August 22, 2005 as attorney for the foreclosing trustee.

28. Because Plaintiff had previously released its trust deeds on the recently sold units but had not actually been paid the escrowed funds held by FATCO, Plaintiff did not know how the escrowed funds should be taken into account in determining the appropriate credit bid to place at the trustee's sale.

29. Plaintiff's payoff calculation did not reflect a deduction of $700,000 for the amounts held by FATCO pursuant to the Escrow Instructions.

30. Plaintiff discussed the issue of how to calculate the credit bid with counsel including Bruce Baird, attorney for Plaintiff, and Blake Heiner, attorney for FATCO, but was unable to reach a consensus on the question.

31. Plaintiff instructed Tom Cook to bid the amount owed on the FNB and RDA loans, no more and no less.

32. At or prior to the trustee's sale, one person expressed an interest in bidding on five of the units separately. To accommodate that request, Plaintiff determined that it would place a credit bid of $680,000 on the five units, but authorize the trustee to allow the third party to match that bid. As a result, the five units were auctioned first, in the sum of $680,000 with a matching bid from the third party, Alan Steed, for the same amount.

33. The five units were therefore sold by the trustee to Alan Steed for $680,000, subject to the backup credit bid by Plaintiff.

34. All of the remaining units and property were then offered for sale by Tom Cook, and a credit bid was placed on behalf of Plaintiff, by Tom Cook for the sum of $4,302,328.31.

35. Tom Cook believed that $4,302,328.31 was the balance remaining owed on the FNB and RDA loans and that he was placing a credit bid in accordance with the instructions of Plaintiff and the March 30, 2005 Agreement.

36. Subsequently, Alan Steed failed to close on four of the five units for which he was the successful bidder. His assignee remitted $119,200 on account of the unit that was closed. Accordingly, Tom Cook deemed that those four units were sold to Plaintiff, pursuant to its backup bid, for the sum of $560,800.

37. On August 31, 2005, a Trustee's Deed in favor of Plaintiff was recorded in the Weber County Recorder's office. The Trustee's Deed reflects a bid by Plaintiff in the amount of $4,302,328.31.

38. The intent of the March 30, 2005 Agreement was that Plaintiff's bid at the trustee's sale would be equal to the remaining balances owed on the FNB and RDA loans.

39. The amount bid by Plaintiff at the trustee's sale was a mistake because it did not take into account the $700,000 held in escrow by FATCO.

40. The mistaken credit bid is Plaintiff's mistake and is not a mistake attributable to the Debtor or the Co-Defendants.

41. Knight's mechanic's lien lapsed because Knight did not timely file a lawsuit to foreclose the lien and is of no further force or effect.

## ANALYSIS

The mistake which created this dispute is a unilateral mistake on the part of Plaintiff. Plaintiff seeks equitable relief to correct the mistake. Under Utah law, equitable relief is traditionally limited to cases of fraud, misrepresentation, duress, undue influence, mistake or waiver. Utah Coal & Lumber Rest., Inc. v. Outdoor Endeavors Unlimited, 40 P.3d 581 (Utah, 2001).

Plaintiff seeks equitable relief in the form of reformation. Because Plaintiff seeks equitable relief from a mistake involving the foreclosure of a trust deed under Utah State law, this court must attempt to follow the law of the State of Utah with respect to this dispute. "When federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court, and, if no such rulings exist, it must endeavor to predict how that high court would rule." Stickley v. State Farm Mutual Automobile Insurance Co., 505 F.3d 1070, 1077 (10th Cir. 2007).

The Utah State Supreme Court has limited the circumstances where reformation is available to a party, stating that:

> [R]eformation of a written instrument exists when it can be satisfactorily proved (1) that the instrument, as made failed to conform to what both parties intended; or (2) that the claiming party was mistaken as to its actual content and the other party, knowing of this mistake, kept silent; or (3) that the claiming party was mistaken as to actual content because of fraudulent affirmative behavior.

Jensen v. Manila Corp. of the Church of Jesus Christ of Latter-Day Saints, 565 P.2d 63, 64-65 (Utah 1977). Plaintiff correctly argues that Guardian State Bank v. Stangl, 778 P.2d 1

(Utah 1989), provides for the remedy of reformation in the case of a unilateral mistake when knowledge of the unilateral mistake by the other party, or a mistake produced by fraud or other inequitable conduct on the part of the nonerring party is shown. Id. at 5. Because the undisputed facts do not satisfy the criteria required for reformation under Utah law, reformation is unavailable to the Plaintiff at summary judgment. "Equitable relief from a mutual mistake is frequently given by a reformation of the contract. But a contract will not be reformed for an unilateral mistake. Equitable relief may, however, be given from an unilateral mistake by a rescission of the contract." Ashworth v. Charlesworth, 231 P.2d 724, 727 (Utah 1951).

Under certain circumstances, equitable relief in the form of rescission is available in the case of a unilateral mistake. Klas v. Van Wagoner, 829 P.2d 135 (Utah Ct.App. 1992). The four elements that must be established in order to obtain such relief are as follows:

1. The mistake must be of so grave a consequence that to enforce the contract as actually made would be unconscionable.

2. The matter as to which the mistake was made must relate to a material feature of the contract.

3. Generally the mistake must have occurred notwithstanding the exercise of ordinary diligence by the party making the mistake.

4. It must be possible to give relief by way of rescission without serious prejudice to the other party except the loss of his bargain. In other words, it must be possible to put him in status quo.

John Call Engineering, Inc. v. Manti City Corp., 743 P.2d 1205, 1209-10 (Utah 1987).

The Court will apply the four elements defined in John Call Engineering to the undisputed facts of this dispute.

**Grave Consequence** - Plaintiff's mistake has caused grave consequence. Whether the enforcement of Plaintiff's erroneous bid would be unconscionable requires that "a court must assess the circumstances of each particular case in light of the twofold purpose of the doctrine, prevention of oppression and of unfair surprise." Resource Management Co. v. Weston Ranch and Livestock Co., 706 P.2d 1028, 1041 (Utah 1985). The circumstances which led to the erroneous credit bid included the following: 1) the intent of both parties with respect to the March 30, 2005 Agreement; 2) the obligation of Plaintiff to honor the terms of the March 30, 2005 Agreement by structuring a credit bid that was equal to the amount owed on the FSB and the RDA obligations such that no deficiency would remain; 3) the funds held in escrow by FATCO; 4) the escrow instructions directing payment to Plaintiff subject to certain defined exceptions; 5) the fact that Plaintiff released portions of its trust deed lien with respect to the escrow funds held by FATCO; and 6) the complexity and the unusual nature of the circumstances surrounding the foreclosure and credit bid. Based upon all of the circumstances surrounding the foreclosure and credit bid, elements of both procedural unconscionability and substantive unconscionability weigh in favor of Plaintiff's argument for equitable relief. Unless equitable relief is afforded, a lopsided, unfair, and unconscionable result will emerge.

**Material Feature** - None of the parties to this dispute argue that Plaintiff's obligation to bid the full amount of the notes was anything less than a material feature of the March 30, 2005 agreement. The obligation to credit bid the full amount owed on the FNB and RDA notes was a material feature of the March 30, 2005 Agreement. Plaintiff's mistake concerning the amount of the credit bid resulted only because the March 30, 2005 Agreement required that Plaintiff make

such a credit bid. Likewise, the Plaintiff's credit bid was, without a doubt, a material feature of the trustee's foreclosure sale.

**Ordinary Diligence** - It is undisputed that Plaintiff went to the extent of consulting its own legal counsel and counsel for FATCO to determine the correct calculation in preparation of its credit bid, and that Plaintiff communicated its bidding directions to Tom Cook, an attorney specializing in real property foreclosure. While these efforts may not rise to the level of extraordinary diligence, these efforts do satisfy the requirement of ordinary diligence.

**The Status Quo** - The Court sees this criteria as the most important of the four elements to be addressed. The relief sought by Plaintiff is equitable relief. Plaintiff put itself into this situation through its own mistake. While equitable relief may be available to a party who, through its own mistake, created the situation, equity demands that those parties who stand blameless of the mistake should not suffer as a result of the remedy sought. "Where one of two innocent parties must suffer through the act or negligence of a third person, the loss should fall upon the one who by his conduct created the circumstances which enabled the third party to perpetrate the wrong or cause the loss." Heaston v. Martinez, 282 P.2d 833, 835 (Utah 1955). This entire dispute was created by Plaintiff's inaccurate credit bid calculations which led directly to Tom Cook's bid in the wrong amount. As required by John Call Engineering, it must be possible to give relief without serious prejudice to the other parties. In other words, it must place the other parties in the status quo, as though the mistake had never occurred.

A debtor in Chapter 11 carries certain duties and responsibilities which include the duty to maximize the estate for benefit of creditors. A debtor in possession, like a bankruptcy trustee, is a

fiduciary whose fiduciary obligations run to the estate. In re Americana Expressways, Inc., 133 F.3d 752 (10th Cir. 1997). Plaintiff's mistake created the possibility for the Debtor to recover funds for the benefit of the estate. Debtor did nothing wrong by asserting a claim to the funds in dispute and by defending itself in this adversary proceeding. In fact, once Debtor's professionals determined that the Debtor's defense had merit, the Debtor had an affirmative duty under the Bankruptcy Code to contest this matter on behalf of and for the benefit of this estate. Willingness to leave the debtor in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee. Id. at 756. As a result, the Debtor's professionals have expended considerable time and expenses litigating this dispute for the benefit of the estate's unsecured creditors. Neither the Debtor, the Debtor's professionals, nor the creditors of this estate should suffer as a result of Plaintiff's mistake. Likewise, the Co-Defendants cannot be blamed for Plaintiff's mistake or the resulting litigation and should not suffer as a result of Plaintiff's mistake.

The Court sees only one remedy that is fair and equitable to all parties. Equity demands that the blameless parties be put in the status quo, and that any loss should fall upon the one who created the circumstance. Accordingly, the fourth element under John Call Engineering, is satisfied only if the Court fashions its equitable ruling as follows: 1) that Plaintiff's erroneous credit bid be rescinded and Plaintiff immediately replace the rescinded credit bid with Plaintiff's corrected credit bid; 2) that Debtor's professionals be reimbursed their reasonable attorney fees and costs by Plaintiff in order to put the Debtor and the Debtor's professionals in the status quo, as though this litigation never occurred; and 3) that the Co-Defendants be reimbursed their

reasonable attorney fees and costs by Plaintiff, and that Co-Defendants be released from any liability or responsibility for attorney fees or costs incurred by Plaintiff or payable by Plaintiff as a direct or indirect result of Plaintiff's mistake.

End of Document